**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BARBARA A. BOOTH,
Plaintiff-Appellee,

v.

WAL-MART STORES, INCORPORATED

ASSOCIATES HEALTH AND WELFARE
PLAN, sued as Wal-Mart Stores,
Incorporated,
Defendant-Appellant.

No. 98-2326

BARBARA A. BOOTH,
Plaintiff-Appellant,

v.

WAL-MART STORES, INCORPORATED

ASSOCIATES HEALTH AND WELFARE
PLAN, sued as Wal-Mart Stores,
Incorporated,
Defendant-Appellee.

No. 98-2348

Appeals from the United States District Court
for the Western District of Virginia, at Danville.
Norman K. Moon, District Judge.
(CA-96-53-D)

Argued: October 27, 1999

Decided: January 14, 2000

Before MURNAGHAN, NIEMEYER, and TRAXLER,
Circuit Judges.

_____

Reversed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Murnaghan and Judge Traxler joined. Judge Murnaghan wrote a concurring opinion.

_____

**COUNSEL**

**ARGUED:** Ashley Bryan Abel, JACKSON, LEWIS, SCHNITZLER & KRUPMAN, Greenville, South Carolina, for Appellant. John Howard Heard, JOHN H. HEARD, P.C., Danville, Virginia, for Appellee. **ON BRIEF:** Iwana Rademaekers, JACKSON, LEWIS, SCHNITZLER & KRUPMAN, Dallas, Texas, for Appellant.

_____

**OPINION**

NIEMEYER, Circuit Judge:

After seeking medical care for chest pain in late November 1994, Barbara A. Booth received a left cardiac catheterization with coronary angiography, followed by a coronary angioplasty to clear a 75% blockage in her right coronary artery. She filed a claim for reimbursement of her expenses under her employee benefit plan, in which she had enrolled four months earlier, but the plan administrator denied the claim under the plan's preexisting condition exclusion.

Claiming that the plan administrator wrongfully denied benefits to which she was entitled, Booth filed this action against the plan under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The district court concluded, after a bench trial, that the plan administrator had abused its discretion in denying benefits, remanded the matter to the administrator for reconsideration in light of the court's opinion, and granted Booth's motion for attorneys fees.

Because we conclude that the plan administrator could not be found to have abused its contractually conferred discretion in the circumstances of this case, we reverse.

2

I

Barbara A. Booth, a full-time employee of Wal-Mart Stores, Inc., enrolled in Wal-Mart's self-funded employee benefit plan (the "Plan") on July 29, 1994, when she became eligible to do so. The parties agree that the Plan is governed by ERISA and constitutes an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1). Wal-Mart is the sponsor of the Plan but does not act as the Plan trustee. The "administrator" of the Plan, as that term is defined in 29 U.S.C. § 1002(16)(A), is the Plan's Administrative Committee.

In late November 1994, roughly four months after subscribing to the Plan, Booth experienced chest pain, which recurred over the course of five days. Her general physician sent her to be examined by Dr. Boshra G. Zakhary, a cardiologist, who recorded that Booth suffered from hypertension, hypertensive cardiovascular disease, and hyperlipidemia (excess fat in the blood). Because of Booth's chest pain, which was consistent with angina, her multiple risk factors for coronary artery disease, and her abnormal EKG, Zakhary performed a left cardiac catheterization with coronary angiography and left ventriculography on December 2, 1994. Through the procedure (during which a small catheter is inserted into the femoral artery in the groin and threaded up into the arteries in the heart, allowing the cardiologist to shoot dye into the coronary arteries and thereby spot blockages), Zakhary learned that the middle segment of Booth's right coronary artery had a 75% stenosis (blockage), prompting him to recommend that Booth receive a coronary angioplasty (in which a small balloon is inflated within the blockage in order to open the artery). Dr. Victor S. Behar performed a coronary angioplasty to Booth's right coronary artery on December 5, 1994. Upon her discharge, Booth was diagnosed with coronary artery disease with unstable angina, hyperlipidemia, hypertension, and anxiety.

Booth sought reimbursement from the Plan to cover the $30,887.18 in medical expenses that she incurred in relation to the coronary angioplasty procedures. The Plan denied her claim after determining that her condition existed before she enrolled in the Plan or was a secondary condition or complication of a preexisting condition and that her expenses were therefore excluded by the Plan's preexisting condition provision. That provision reads:

3

Benefits shall not be payable for the following:

Pre-existing conditions.

Any charges with respect to any participant for any illness, injury, or symptom (including secondary conditions and complications) which was medically documented as existing, or for which medical treatment, medical service, prescriptions or other medical expense was incurred within 12 months preceding the effective date of these benefits as to that participant, shall be considered pre-existing and shall not be eligible for benefits under this Medical Coverage, until the participant has been continuously covered under the Medical Coverage 12 consecutive months. (Pre-existing conditions include any diagnosed or undiagnosed condition.)

Booth appealed the denial of her claim, asserting that she had been treated previously for high blood pressure and cholesterol but not for any heart condition. Also, Dr. Julian A. Koplen, Booth's general physician, who provided most of her medical care during the 12-month exclusionary period before her enrollment in the Plan, sent a letter to the Plan stating that he had reviewed Booth's records and found no evidence of preexisting coronary artery disease. He explained that the abbreviation "PVI," which appeared in his treatment records of Booth, denoted "peripheral venous insufficiency" (incompetent veins in legs, resulting in pooling of blood), not "peripheral vascular insufficiency" (insufficient arterial blood supply, resulting in difficulty supplying oxygenated blood to the limbs).

The Plan reviewed its denial of Booth's claims and, as part of its normal appeal process, sought a medical review of its previous determination. The Plan sent Booth's medical records to Dr. William M. Allen, a cardiologist, who was directed to "document any illness, injury or symptom, including secondary conditions and complications" that were related to Booth's diagnoses in November and December 1994 and that had been documented as existing during the 12-month exclusionary period. In summarizing his findings, Dr. Allen related that "[t]he diagnoses of hypertensive heart disease and hyperlipidemia were clearly present" during the exclusionary period. He also

4

stated his belief that Booth had also been treated for coronary artery disease during that period. He noted that, although none of the relevant medical records diagnosed coronary artery disease, Dr. Behar, who performed Booth's coronary angioplasty, had indicated that Booth's coronary artery disease dated back to 1986 when she was evaluated for chest pain.[1] Allen noted that during the exclusionary period Booth was taking Cardizem, a medicine "effective not only for hypertension but also coronary artery disease and angina."

The Plan's Administrative Committee met on August 9, 1995, to consider Booth's appeal and decided to postpone a decision until its next meeting in order to obtain another medical review of the file by a general practitioner, Dr. James H. Arkins. It made this decision because Dr. Koplen was a general practitioner and had disputed the conclusion of Dr. Allen, a cardiologist, that Koplen's records contained evidence of preexisting coronary heart disease or symptoms to suggest the condition.

After reviewing Booth's records, Dr. Arkins reported that he found "numerous pages of documentation of treatment for heart disease and hyperlipidemia" in Booth's medical records from the exclusionary period. He specifically pointed to Dr. Koplen's documentation of Booth's treatment for "HCVD," which Arkins defined as "hypertensive coronary vascular disease," and to Booth's prescription for Cardizem. Dr. Arkins advised the Plan's Administrative Committee, however, that he found no evidence of preexisting hypopotassemia, lung disease, or abnormal blood chemistry.

The Plan's Administrative Committee met again to review Booth's

_____

[1] Booth attempted to provide evidence to the district court that the 1986 episode was unrelated to heart problems. The district court properly refused to consider this evidence, however, because it was not before the Administrative Committee when it made its determinations. See Elliott v. Sara Lee Corp., 190 F.3d 601, 608 (4th Cir. 1999) ("When a district court reviews a plan administrator's decision under the abuse of discretion standard, `an assessment of the reasonableness of the administrator's decision must be based on the facts known to it at the time'") (quoting Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994)).

5

appeal and determined that hypopotassemia, lung disease, and abnormal blood chemistry were not preexisting conditions and that expenses incurred by Booth for their treatment would therefore be reconsidered for payment. But the Plan's Administrative Committee again denied Booth's remaining claims relating to the coronary angioplasty, finding that they were related to preexisting conditions and thus not eligible for coverage.

Booth continued to contest the decision of the Administrative Committee. Dr. Koplen sent a second letter on her behalf to the Committee on October 12, 1995, and reiterated that Booth never had any evidence of coronary disease while she was his patient. He also stated that he believed confusion may have stemmed from a misunderstanding of his abbreviation "HCVD." He stated that, while the Plan's reviewers interpreted HCVD to signify "hypertensive coronary vascular disease," he used the abbreviation to denote"hypertensive cardiovascular disease," a term he asserted physicians use loosely to describe high blood pressure. Also, on March 13, 1996, Booth's attorney sent the Plan a request for another appeal. Thereafter, he forwarded a letter written by Dr. Stephen V. Davis, which stated that Booth was neither treated for nor diagnosed as having coronary artery disease or angina prior to November 1994. Davis' letter also explained that HCVD is a term used by physicians to denote either hypertensive cardiovascular disease or hypertensive coronary vascular disease.

A subcommittee of the Plan's Administrative Committee reviewed Booth's case on June 19, 1996, but postponed a decision until a meeting of the full Administrative Committee. On July 8, 1996, the Plan's Administrative Committee met, reviewed the entire appeal file, and again denied Booth's heart-disease-related claims because of the existence of a preexisting condition. The Administrative Committee based this determination on three factors: (1) a Plan policy that hypertension is a symptom of heart disease; (2) documentation in Booth's file indicating she had been treated for heart disease; and (3) Booth's treatment with Cardizem, which is prescribed for heart conditions.

Booth then filed this action in state circuit court in Danville, Virginia, to recover benefits under the terms of the Plan pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). Wal-Mart re-

moved the case to federal court. Following a bench trial, the district court issued an opinion and order dated May 22, 1998, in which it held that the Plan had abused its discretion in denying Booth's claims for benefits. The court stated that the Plan's Administrative Committee "wrongfully assumed that evidence of hypertension was proof of heart disease and that treatment with Cardizem was proof of heart disease" and that these assumptions "caused the Committee to accord less weight to important evidence before it." The court remanded the matter to the Plan's Administrative Committee for reconsideration in light of its opinion. On August 4, 1998, the district court also awarded Booth $7,000 in attorneys fees. This appeal followed.

II

Because the standard of judicial review is dispositive in this case, we turn first to the proper standard for judicial review of a plan administrator's decision to grant or deny benefits under an employee welfare benefit plan regulated by ERISA.

Because ERISA does not specify the appropriate standard of judicial review of a fiduciary decision, courts are instructed to develop a federal common law, guided by principles of trust law. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109-11 (1989). Thus, as a general proposition, ERISA plans, as contractual documents, see Wheeler v. Dynamic Eng'g, Inc., 62 F.3d 634, 638 (4th Cir. 1995), are interpreted de novo by the courts, which conduct their review "without deferring to either party's interpretation." Firestone, 489 U.S. at 112. "If the plan [does] not give the employer or administrator discretionary or final authority to construe uncertain terms, the court review[s] the employee's claim as it would . .. any other contract claim -- by looking to the terms of the plan and other manifestations of the parties' intent." Id. at 112-13. Thus, we have held that in deciding whether a plan provision for benefits is prescriptive or discretionary, we review the Plan's language de novo. See Haley v. Paul Revere Life Ins. Co., 77 F.3d 84, 89 (4th Cir. 1996). Similarly, in determining the scope of contractually conferred discretion and whether a fiduciary has acted within that scope, we act de novo. See id.

When, however, a plan by its terms confers discretion on a fiduciary and the fiduciary acts within the scope of conferred discretion,

7

we defer to the fiduciary in accordance with well-settled principles of trust law: "Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion." Firestone, 489 U.S. at 111 (quoting Restatement (Second) of Trusts § 187 (1959)). Thus, a trustee's discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion. See id.; de Nobel v. Vitro Corp., 885 F.2d 1180, 1185-86 (4th Cir. 1989).

A survey of our cases decided after Firestone reveals a certain ambiguity about the appropriate standard of review of a fiduciary's discretionary decision -- whether it is "abuse of discretion" or "arbitrary and capricious" and whether the two standards are equivalent. In a number of decisions we stated expressly that we were not prepared to decide whether the abuse of discretion standard differs from the arbitrary and capricious standard. See Brogan v. Holland, 105 F.3d 158, 161 n.3 (4th Cir. 1997) (declining to resolve the issue because any difference between the two standards in the case at hand was inconsequential); Bernstein v. CapitalCare, Inc., 70 F.3d 783, 787 n.4 (4th Cir. 1995) (same); Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 125 n.4 (4th Cir. 1994) (same); Lockhart v. United Mine Workers of Am. 1974 Pension Trust, 5 F.3d 74, 77 n.5 (4th Cir. 1993) (same). In other cases, we sent conflicting signals about the relationship between the two standards of review. See Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 158-59 (4th Cir. 1993) (equating the two standards, stating that plan decisions "subject to the abuse of discretion standard . . . must be affirmed if they are not arbitrary or capricious"); Richards v. United Mine Workers of Am. Health & Retirement Fund, 895 F.2d 133, 135-36 (4th Cir. 1990) (stating that, although the "`abuse of discretion' standard is perhaps broader and less deferential than the `arbitrary and capricious' standard, `arbitrary and capricious' definitely is encompassed by `abuse of discretion'"). See also Michael A. de Freitas, Annotation, Judicial Review of Denial of Health Care Benefits Under Employee Benefit Plan Governed by Employee Retirement Income Security Act (ERISA) (29 USCS § 1132(a)(1)(B))-- Post Firestone Cases, 128 ALR Fed. 1, 20 (1995) ("[F]ew cases differentiate between the two most-frequently described standards of `arbitrary-and-capricious' and `abuse-of-discretion'"); id. at 81-82 (collecting

8

cases supporting view that the standards are equivalent). We now put to rest any doubt about the appropriate standard of judicial review of a discretionary decision by a plan administrator or fiduciary and the elements of that standard.

First, we continue to recognize that an "arbitrary and capricious" standard is more deferential to the fiduciary than is an "abuse of discretion" standard. And second, we affirm that the abuse of discretion standard, not the arbitrary and capricious standard, is the appropriate one for judicial review of a fiduciary's discretionary decision under ERISA. In de Nobel, we interpreted Firestone as "mandat[ing] total abandonment of the `arbitrary and capricious' formulation," the standard we had previously applied to review benefit determinations of plan administrators and fiduciaries under § 1132(a)(1)(B). 885 F.2d at 1186. We described the arbitrary and capricious standard as "more deferential" to the fiduciary than the abuse of discretion standard and noted that application of the former standard "would be inconsistent with the manifest purposes of [ERISA]." Id. at 1185. In reaching these conclusions, we were guided directly by Firestone's discussion about the inappropriateness of applying, in the ERISA context, an arbitrary and capricious standard which had been developed in cases arising under the Labor Management Relations Act ("LMRA"). See Firestone, 489 U.S. at 109-10 (noting that the reason for applying an arbitrary and capricious standard in LMRA cases is not applicable to ERISA cases). Accordingly, we repeat that the standard for review under ERISA of a fiduciary's discretionary decision is for abuse of discretion, and we will not disturb such a decision if it is reasonable. See id. at 111; Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997); Haley, 77 F.3d at 89; de Nobel, 885 F.2d at 1187.

In determining whether a fiduciary's exercise of discretion is reasonable, numerous factors have been identified as relevant, both in the cases applying ERISA and in principles of trust law. In Firestone, for example, the Supreme Court indicated that the fact that a fiduciary operates under a conflict of interest must be weighed in determining whether there is an abuse of discretion. See Firestone, 489 U.S. at 115; accord Doe v. Group Hospitalization & Med. Services, 3 F.3d 80, 85 (4th Cir. 1993). In de Nobel we identified five factors that had previously been considered in our opinions: (1) whether the administrator's interpretation is consistent with the goals of the plan; (2)

9

whether it might render some language in the plan documents meaningless or internally inconsistent; (3) whether the challenged interpretation is at odds with the procedural and substantive requirements of ERISA; (4) whether the provisions at issue have been applied consistently; and (5) whether the fiduciary's interpretation is contrary to the clear language of the plan. See 885 F.2d at 1188. We have also recognized that the adequacy of the record before the fiduciary is a factor to be considered. See Bernstein, 70 F.3d at 788. Drawing on principles of trust law, as instructed by Firestone and as articulated in the Restatement (Second) of Trusts § 187, on which Firestone relied, we identified five other factors, which were somewhat different from, but not inconsistent with, those listed in de Nobel: (1) the scope of the discretion conferred; (2) the purpose of the plan provision in which discretion is granted; (3) any external standard relevant to the exercise of that discretion; (4) the administrator's motives; and (5) any conflict of interest under which the administrator operates in making its decision. See Haley, 77 F.3d at 89; see also Ellis, 126 F.3d at 233. Another important factor is furnished by the Restatement, which notes that the integrity of the fiduciary's decisionmaking process may also be considered. See Restatement (Second) of Trusts § 187, cmts. e-h (1959).

Combining these various criteria for determining the reasonableness of a fiduciary's discretionary decision, we conclude that a court may consider, but is not limited to, such factors as: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. **2**

_____

**2** A fiduciary's conflict of interest, in addition to serving as a factor in the reasonableness inquiry, may operate to reduce the deference given to a discretionary decision of that fiduciary. We have held that a court, presented with a fiduciary's conflict of interest, may lessen the deference given to the fiduciary's discretionary decision to the extent necessary to "neutralize any untoward influence resulting from that conflict." Doe, 3 F.3d at 87; see also Ellis, 126 F.3d at 233; Bedrick v. Travelers Ins. Co., 93 F.3d 149, 152 (4th Cir. 1996).

10

With these principles in hand, we now turn to the Plan before us and the decision by the Plan's administrator to deny benefits.

III

As with any interpretation of a contractual trust document, we begin by examining the language of the Plan to determine whether the provision of benefits is prescriptive or discretionary and, if discretionary, whether the plan administrator acted within its discretion. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997); Haley v. Paul Revere Life Ins. Co., 77 F.3d 84, 89 (4th Cir. 1996); de Nobel v. Vitro Corp., 885 F.2d 1180, 1186 (4th Cir. 1989). This review is conducted de novo.

The express terms of the Wal-Mart employee benefit plan give the Plan's Administrative Committee "complete discretion to interpret the provisions of the Plan, make findings of fact, correct errors, and supply omissions." And the scope of this discretion is unusually broad. The Plan provides, "All decisions and interpretations of the Plan Administrator made in good faith pursuant to the Plan shall be final, conclusive and binding on all persons, subject only to the claims procedure, and may not be overturned unless found by a court to be arbitrary and capricious."

From this contractual language, it might be argued that the Plan is attempting to limit courts in their review to the narrowest of circumstances, i.e., whether the administrator acted in bad faith. Moreover, the Plan purports to return judicial review to the pre-Firestone/de Nobel standard of "arbitrary and capricious." But to interpret the Plan in this manner would impinge on the proper role of courts in enforcing contracts and establishing principles of judicial review. Both Firestone and de Nobel articulate standards of judicial review of discretionary decisions by fiduciaries in the context of ERISA and its purposes. While the ERISA jurisprudence recognizes that parties have broad authority through contractual language to agree on the scope of benefits and the procedures to follow in applying for them, we do not understand ERISA to allow a plan to alter the established standard of judicial review of discretionary decisions for reasonableness.

11

Taking into account the entire Plan before us, however, we do not interpret the Plan's language to authorize discretionary decisions that would violate established principles of reasonableness. The Plan thoroughly delineates benefits to which its beneficiaries are entitled, and it carefully details benefit eligibility requirements. It would be incongruous to interpret the Plan documents before us as additionally conferring such broad discretion on its administrator as to sanction determinations that would not withstand analysis using the reasonableness factors that have been recognized by Firestone and its progeny in the Fourth Circuit. The Plan does not authorize its administrator to make determinations that are contrary to the plain language of the Plan; that frustrate the purposes and goals of the Plan; that are inconsistent with other provisions or earlier interpretations of the Plan; that are rendered pursuant to arbitrary or uninformed decisionmaking processes; that are inconsistent with the procedural and substantive requirements of ERISA; or that are made in furtherance of an interest that conflicts with that of the Plan beneficiaries.

Accordingly, we conclude that the Plan in this case provides its administrator with discretion to interpret Plan language and to grant or deny benefits in accordance with these interpretations, but we will enforce the administrator's decisions only if they are reasonable, applying the factors that we have previously identified. In addition, we conclude that the Administrative Committee in interpreting the Plan's preexisting-condition provision and in denying in part Booth's claim for benefits acted within the scope of discretion conferred by the Plan documents.

Because the administrator was given discretion to make the decisions under review in this case and acted within the scope of this discretion, we will not disturb the administrator's decision if it is reasonable, even if we independently would have come to a different conclusion. See Firestone, 489 U.S. at 115; Ellis, 126 F.3d at 232. Where a plan administrator has offered a reasonable interpretation of disputed provisions, we may not replace it with an interpretation of our own. See de Nobel, 885 F.2d at 1188. Thus, we are confined to a review of whether a decision of the Plan's Administrative Committee to deny a large portion of Booth's claim for benefits was an unreasonable exercise of its discretion, applying the factors set forth in Part II, above.

12

IV

In the district court, Booth challenged the decision of the Plan's Administrative Committee to deny in part her claim for benefits, implicating two factors in our "reasonableness" inquiry under the abuse of discretion standard of review: (1) the degree to which the materials before the committee supported its decision, and (2) the process by which the decision was made. The district court reversed the Administrative Committee's partial denial of Booth's claim for benefits, finding that the committee "failed to employ a rational and principled approach when it wrongfully assumed that evidence of hypertension was proof of heart disease and treatment with Cardizem was proof of heart disease." The court concluded that these errors "caused the Committee to accord less weight to important evidence before it," warranting reversal of the committee's decision.

A review of the record reveals, however, that (1) the process by which the Administrative Committee reached its decision was principled and reasoned, and (2) its conclusions were supported by the evidence before it. While a plan administrator could conceivably act unreasonably -- and thus abuse its discretion-- by following a policy that dictated a result contrary to the evidence before it, this is not such a case. The Administrative Committee sought numerous reviews by independent doctors; considered all the records and letters submitted by Booth, Dr. Koplen, and Dr. Davis; and arrived at a determination based on three factors: (1) the Plan's policy that hypertension is a symptom or secondary condition of coronary artery problems; (2) documentation in Booth's file indicating she had been treated for heart disease; and (3) the fact that Booth was treated with Cardizem, a medicine for treating both heart disease and hypertension. The Administrative Committee's partial reliance on its policy concerning hypertension, even if we were to assume that the policy was flawed, did not render its reasoning process unprincipled. The Administrative Committee relied on other factors which alone could have supported its decision. It is also telling that the Administrative Committee partially reversed itself with respect to Booth's claim, awarding benefits to Booth to cover her treatment relating to hypopotassemia, lung disease, and abnormal blood chemistry. We can find no evidence in the record supporting a conclusion that the Administrative Committee

13

came to its decision through a process that was unprincipled or unreasonable.

Moreover, the evidence before the Administrative Committee supported its determination that the Plan's preexisting-condition provision excluded Booth's claim for benefits. The Plan's preexisting-condition provision is quite broad, excluding from coverage not only conditions for which a beneficiary was treated during the exclusionary period, but also any symptom or secondary condition of such a condition. While the breadth of this provision could well take unwary plan beneficiaries by surprise, it nonetheless is a valid contractual provision.

The Administrative Committee had before it the report of Dr. Allen, a cardiologist, who stated that "[t]he diagnoses of hypertensive heart disease and hyperlipidemia were clearly present" during the exclusionary period. Dr. Allen stated that during that same period he believed that Booth was also treated for coronary artery disease. The Plan also received a letter from Dr. Arkins, a general practitioner, detailing "numerous pages of documentation of treatment for heart disease and hyperlipidemia" in Booth's records from the exclusionary period. These conditions observed during the exclusionary period are the same for which Booth later sought benefits. Dr. Arkins pointed to the indication in the records that Booth was treated for "HCVD," interpreting the abbreviation to mean "hypertensive coronary vascular disease." Both Drs. Arkins and Allen found it significant that Booth was treated with Cardizem, which Dr. Allen indicated "is effective not only for hypertension but also coronary artery disease and angina." Moreover, Dr. Arkins reviewed Booth's file a second time after the Administrative Committee received a letter from Booth's general practitioner disputing Arkins' interpretation of the "HCVD" notation in Booth's records, and he affirmed his earlier opinions.

Letters from Booth, Dr. Koplen, and Dr. Davis presented evidence to the Administrative Committee that conflicted with the opinions of the reviewing Drs. Allen and Arkins. Dr. Koplen's letter disputed that Booth had suffered from preexisting coronary heart disease or symptoms to suggest coronary heart disease. Dr. Koplen contended that his abbreviations were misinterpreted and that "HCVD" represented "hypertensive cardiovascular disease." He also stated that he prescribed

14

Cardizem merely to treat Booth's hypertension. Dr. Davis stated that the abbreviation "HCVD" often causes confusion among doctors and that there was no evidence in Booth's records that Booth was treated for coronary artery disease prior to her enrollment in the Wal-Mart employee benefit plan. Dr. Davis gave his opinion that Booth's rapid development of symptoms of coronary artery disease was consistent with the often rapid process by which blockages in a person's arteries can develop. He also characterized high blood pressure as a risk factor for, not a symptom of, coronary artery disease.

Confronted with this record of conflicting opinion, it was within the discretion of the Administrative Committee -- indeed it was the duty of that body -- to resolve the conflicts, and as we have previously recognized, "it is not an abuse of discretion for a plan fiduciary to deny . . . benefits where conflicting medical reports were presented." Elliott v. Sara Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999) (citing Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 234 (4th Cir. 1997) (finding no abuse of discretion in denial of benefits where beneficiary's primary medical provider's finding of disability conflicted with reports of independent medical panel)). Because sufficient evidence is contained in the record to support the determination that Booth was treated during the exclusionary period for either the same condition later treated in November 1994 or a symptom or secondary condition thereof, the district court clearly erred in concluding that the Plan's Administrative Committee abused its discretion in denying Booth benefits. In light of this evidence and the principled and reasoned process by which the Administrative Committee rendered its decision, there is no basis to conclude that the Administrative Committee abused its discretion when it denied in part Booth's claim.

Accordingly, we reverse the judgment of the district court as well as its award of attorneys fees.

REVERSED

MURNAGHAN, Circuit Judge, concurring:

I concur in Judge Niemeyer's majority opinion. The Plan's preexisting-condition provision allows the Administrative Committee to deny benefits for a condition, or symptom or secondary condition

15

thereof, for which the beneficiary was treated during the exclusion period. Because there was evidence before the Administrative Committee that Booth was treated for hypertension during the exclusion period, and because hypertension is a well-known risk factor and arguably a secondary condition to coronary artery disease, that portion of the Administrative Committee's decision which found that Booth was treated for a symptom or secondary condition of coronary artery disease during the exclusion period was reasonable.

For that reason alone, I would find that the Administrative Committee acted reasonably. I am nevertheless troubled by the way in which the Administrative Committee ignored the statements by Booth's own doctors that Booth was not treated for coronary artery disease itself during the exclusion period. I cannot agree that it is reasonable for a plan administrator to ignore credible evidence presented by a claimant's own doctors and instead rely on the conflicting opinions of reviewing doctors who have never treated the claimant and who have no basis for correctly interpreting ambiguous or possibly mistaken notations in the claimant's medical records.

16