**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 04-2135**

MARGARET MULLINS,

              Plaintiff - Appellee,

        v.

AT&T CORPORATION,

              Defendant – Appellant,

        and

CONNECTICUT GENERAL LIFE INSURANCE COMPANY; AT&T LONG TERM
DISABILITY PLAN FOR OCCUPATIONAL EMPLOYEES; AT&T MEDICAL
EXPENSE PLAN FOR OCCUPATIONAL EMPLOYEES,

              Defendants.

**No. 04-2136**

MARGARET MULLINS,

              Plaintiff - Appellant,

        v.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY; AT&T LONG TERM
DISABILITY PLAN FOR OCCUPATIONAL EMPLOYEES; AT&T
CORPORATION; AT&T MEDICAL EXPENSE PLAN FOR OCCUPATIONAL
EMPLOYEES,

              Defendants - Appellees.

---

**No. 07-1717**

---

MARGARET MULLINS,

             Plaintiff - Appellant,

     v.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY; AT&T LONG TERM DISABILITY PLAN FOR OCCUPATIONAL EMPLOYEES; AT&T CORPORATION; AT&T MEDICAL EXPENSE PLAN FOR OCCUPATIONAL EMPLOYEES,

             Defendants - Appellees.

---

**No. 10-2010**

---

MARGARET MULLINS,

             Plaintiff - Appellant,

     v.

AT&T CORPORATION,

             Defendant – Appellee,

     and

CONNECTICUT GENERAL LIFE INSURANCE COMPANY; AT&T LONG TERM DISABILITY PLAN FOR OCCUPATIONAL EMPLOYEES; AT&T MEDICAL EXPENSE PLAN FOR OCCUPATIONAL EMPLOYEES,

             Defendants.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (CA-03-69; 1:03-cv-00069-GBL-TCB)

---

Argued: January 26, 2011         Decided: April 20, 2011

---

Before TRAXLER, Chief Judge, and NIEMEYER and AGEE, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Robert Barnes Delano, Jr., SANDS ANDERSON, PC, Richmond, Virginia, for AT&T Corporation, Connecticut General Life Insurance Company, AT&T Long Term Disability Plan for Occupational Employees, and AT&T Medical Expense Plan for Occupational Employees. Patricia Ann Smith, LAW OFFICES OF PATRICIA A. SMITH, Alexandria, Virginia, for Margaret Mullins. **ON BRIEF:** Jeffrey H. Geiger, SANDS ANDERSON, PC, Richmond, Virginia, for AT&T Corporation, Connecticut General Life Insurance Company, AT&T Long Term Disability Plan for Occupational Employees, and AT&T Medical Expense Plan for Occupational Employees.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Margaret Mullins appeals the district court's decision granting summary judgment against her on her claim for disability benefits under a long-term disability plan (the "LTD Plan" or "Plan") self-funded by her employer, AT&T Corporation ("AT&T"), administered by Connecticut General Life Insurance Company ("CGLIC"), and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). See 29 U.S.C. § 1132(a)(1)(B). AT&T cross-appeals the district court's decision imposing a penalty under 29 U.S.C. § 1132(c)(1) for AT&T's failure to produce a copy of the Summary Plan Description ("SPD") upon Mullins' request. We affirm.

I.

Mullins was employed by AT&T as a communications assistant. In this capacity, she handled "relay" calls for disabled persons that required her to type telephone conversations as quickly as possible. While at AT&T, Mullins was covered by the LTD Plan. Under the Plan, an employee is considered disabled, and therefore entitled to LTD benefits, when:

> in the sole opinion of [CGLIC], [the employee] is determined to be incapable of performing the requirements of any job for any employer (including non-AT&T employment), (as a management or occupational employee), for which the individual is qualified or may reasonably become qualified by training, education

4

or experience, other than a job that pays less than 50 percent of [the employee's] annual Base Pay.

J.A. 365.

In April 1998, Mullins was diagnosed with bilateral carpal tunnel syndrome ("CTS") which caused her to experience sensitivity and pain in her hands. Mullins also had diabetes, which was thought to aggravate her CTS condition. In late 1998 and early 1999, Dr. Stephen Schroering, an orthopedic surgeon, performed carpal tunnel surgery on both of her hands. Mullins returned to work at AT&T on April 8, 1999, but her physician determined that she was unable to perform the continuous and repetitive keyboarding duties required by her position. She stopped working at AT&T effective April 16, 1999.

On April 23, 1999, Dr. Schroering stated that Mullins' condition prohibited her from "work requiring repetitive or forceful grasping with either hand, greater than 50% of her maximum grip strength," and other "work requiring repetitive work with either hand, including keyboard work." J.A. 548. However, Dr. Schroering noted that Mullins "does well as long as she is not doing" such repetitive work throughout the day. J.A. 548. He felt that Mullins was unable "to return to her usual and customary work as an AT&T operator, and w[ould] require vocational rehabilitation." J.A. 548. Dr. Schroering assigned Mullins a 10% permanent disability for mild residual carpal

5

tunnel symptoms in the right hand and a 10% permanent disability for mild residual carpal tunnel symptoms in the left hand, which equated to a 12% whole person permanent disability. Dr. Schroering left his practice in mid-1999.

In September 1999, Mullins applied for benefits under the LTD Plan, claiming that the pain and weakness in her hands rendered her "incapable of performing the requirements of any job for any employer" under the terms of the Plan. J.A. 365. Mullins, a high school graduate with two years of college education, was 35 years old at the time. CGLIC began its evaluation of Mullins' LTD claim by obtaining copies of the medical records from the physicians identified in her application. In addition to Dr. Schroering, Mullins listed Dr. Leopoldo Bendigo, Dr. Robert Strang, Dr. Douglas Williams, and Dr. N.C. Ratliffe as her treating physicians.

Dr. Bendigo, an orthopedic surgeon, performed an independent medical examination of Mullins on May 14, 1999. He stated that Mullins was unable to return to her duties at AT&T "at this point in time." J.A. 545. However, he felt that she had not reached maximum medical improvement and prescribed three to six months of physical therapy.

Dr. Strang, an orthopedic surgeon, began seeing Mullins in early August 1999, after Dr. Schroering left his practice. Dr. Strang suggested physical therapy and referred Mullins to Dr.

6

Williams, a neurologist, for his opinion and recommendations regarding the continued pain and sensitivity in her hands. Dr. Williams had previously performed nerve conduction studies on Mullins in May 1998, prior to her CTS surgeries, but felt that she did not have CTS at that time. On September 23, 1999, Dr. Williams noted that Mullins had "pretty good grip strength," but was continuing to experience bilateral hand pain. J.A. 488. It was his impression that she had a "small fiber neuropathy . . . related to her diabetes." J.A. 553. He continued to believe that her problems were unrelated to CTS. He prescribed medication and asked Mullins to follow-up with him in two weeks. On September 28, 1999, Dr. Strang advised that Mullins had "neuropathy of both hands due to the carpal tunnel syndrome and the diabetic neuropathy," and was unable to return to work "[a]t this time." J.A. 443.

Dr. Ratliff was Mullins' family doctor. In October 1999, he completed a statement of disability, stating that Mullins had a "[s]evere limitation of functional capacity" and was "incapable of minimal (sedentary) activity." J.A. 492. It was his opinion that Mullins was totally disabled from her position at AT&T and from "any other work." J.A. 492. However, he noted that Mullins' prognosis was "[g]uarded," and offered no opinion as to whether a fundamental or marked change was expected.

7

In October 1999, Dr. Strang and Dr. Williams each completed a physical assessment at the request of CGLIC, based on their evaluation of Mullins. Dr. Strang stated that Mullins could sit, stand and walk for eight hours a day, and occasionally reach above and below her shoulders, but was unable to lift, carry, push or pull, perform simple or firm grasping, or perform fingering/keyboarding or other fine manipulation. J.A. 444. Dr. Williams stated that Mullins could sit for 8 hours a day, stand and walk for 7 hours a day, lift and carry up to 20 pounds frequently, lift and carry up to 50 pounds occasionally, push and pull occasionally, reach above and below her shoulders frequently, and perform simple grasping frequently, and occasionally perform fingering/keyboarding and other fine manipulation. On January 17, 2000, Dr. Williams reevaluated Mullins. He stated that Mullins' predominant deficits were sensory and assigned Mullins a 4% functional impairment in each upper extremity, which equated to a 4% overall impairment.

Due to the conflicting medical evidence as to Mullins' physical abilities, particularly from her specialists, Dr. Strang and Dr. Williams, CIGNA referred Mullins' case to a physician advisor, Dr. Thomas Franz, for his review. Dr. Franz advised that the current information failed to allow for a definitive diagnosis and failed to support a finding of physical inability to work at a light or sedentary level.

8

On January 27, 2000, CGLIC denied Mullins' claim for benefits as submitted, advising her that there was insufficient evidence to support her claim that she was "incapable of performing the requirements of any job for any employer" under the terms of the Plan.  J.A. 365.  In support of the decision, CGLIC noted the differing views of Dr. Strang and Dr. Williams, as well as the review by Dr. Franz.

Upon Mullins' request for review of CGLIC's denial, CGLIC obtained updated medical records from her treating physicians. In addition, CGLIC consulted a physician advisor, Dr. Edward Kern, for an opinion as to whether Mullins had a psychological condition that would impact her ability to work.  Dr. Pierce Nelson had previously diagnosed Mullins with major depression in November 1999, and raised questions as to Mullins' ability to function as a result.  However, Dr. Nelson also noted that Mullins was able to drive to her examination and manage her financial affairs.  Dr. Kern, who is board-certified in psychiatry and neurology, reviewed Mullins' records, including those of Dr. Nelson, and reported that the information did not address functionality and that malingering was a concern.

The updated medical records from Mullins' treating physicians for her hand pain and sensitivity continued to demonstrate conflicting opinions regarding both her diagnosis and her ability to work.  On April 18, 2000, Dr. Strang advised

9

that Mullins "has a confusing case of neuropathy of the hands." J.A. 528. He also noted that there was an additional dispute between two neurologists, Dr. Williams and Dr. Dew, as to the cause of her pain. Dr. Strang concluded that "[a]t any rate, it would appear that [Mullins] does have significant pain in her hands, and it would appear that she is still unable to do her work." J.A. 528.

On June 13, 2000, Dr. Erdogan Atasoy, a specialist in hand surgery, evaluated Mullins. Dr. Atasoy diagnosed Mullins with "thoracic outlet compression and associating myofascitis." J.A. 581. Dr. Atasoy stated that Mullins could perform "[l]ight work lifting 20 lbs maximum with frequent lifting or carrying restricted to 10 lbs or less." J.A. 582-83. She was to avoid work requiring "constant repetitive/static use of both hands – pushing/pulling, pinching/gripping, flexion/extension of wrist/elbow, pronation/supination (palm down/palm up)," the "use of vibratory tools," overhead work, climbing poles or ladders, and unprotected heights. J.A. 583. He suggested a "[s]lower pace work" and limited her to a "[w]ork day not to exceed more that 6 hours per day/5 days per week." J.A. 583.

In light of the continuing conflict between Mullins' physicians, CGLIC next referred Mullins for a functional capacity examination ("FCE"). The evaluation took place for several hours over 2 days, and identified a number of physical

10

strengths and limitations. Because Mullins was unable to lift 10 pounds occasionally and right-hand carry, the FCE indicated that Mullins capabilities could not be classified as "sedentary" under the Dictionary of Occupational Titles. However, the FCE recommendation was that Mullins should be able to return to a job within the specific capabilities and restrictions set forth in the activity report of the FCE. No additional physical rehabilitation was recommended.

CGLIC forwarded the results of the FCE to Drs. Ratliffe, Strang, Williams, and Atasoy for their review and comment. Dr. Ratliffe did not respond. Dr. Strang stated that Mullins was still unable to work. Dr. Williams and Dr. Atasoy, however, both agreed that Mullins was capable of performing full-time sedentary work in accordance with the limitations listed in the FCE.

In October 2000, CGLIC referred Mullins' file for a Transferable Skills Analysis ("TSA") to determine whether there were jobs that Mullins could perform within the limitations identified in the FCE. The TSA revealed three jobs that Mullins could perform based upon her skills, education, and abilities, and which met the salary restrictions for resolution of her claim. Specifically, Mullins was able to work as a space scheduler, insurance clerk, or call-out operator. In November 2000, CGLIC also referred Mullins' file for a Labor Market Study

11

("LMS"), in order to determine whether there were employers within Mullins' geographical area that would actually accommodate her limitations and meet the wage replacement requirements of the Plan. The LMS identified six employers with existing job openings that would accommodate Mullins' limitations.

On November 27, 2000, CGLIC sent Mullins a letter upholding the initial denial of LTD benefits, based upon its determination that Mullins was able to perform sedentary work within her limitations and, therefore, that she was not "incapable of performing the requirements of any job for any employer" under the terms of the Plan. J.A. 365. Mullins again requested reconsideration of the decision. On January 9, 2003, after review by an appeals team, CGLIC issued its final denial of Mullins' claim for LTD benefits.

II.

Mullins brought this lawsuit in district court under 29 U.S.C. § 1132(a)(1)(B), claiming that the defendants improperly denied her benefits under the LTD Plan. Mullins later amended her complaint to seek statutory penalties under 29 U.S.C. § 1132(c)(1)(B) for AT&T's failure to produce to her a copy of the SPD upon her request for the LTD Plan documents. On cross-motions for summary judgment, the district court granted summary

12

judgment for the defendants on Mullins' claim for LTD benefits. However, the district court granted summary judgment to Mullins on her claim for statutory penalties and ordered AT&T to pay Mullins penalties totaling $18,400. Mullins appealed the district court's decision on her claim for LTD benefits and AT&T appealed the district court's imposition of the penalty.

This is the third appeal from the district court's grant of summary judgment to the defendants on Mullins' claim for LTD benefits. Mullins argued below that CGLIC had abused its discretion by denying her claim in part because CGLIC had violated its internal procedures during its consideration of her claim. However, until recently, Mullins' attempts to obtain the production of the claims manuals, protocols, and other internal guidelines relating to the processing of LTD claims and appeals from claims denials had been unsuccessful. Without addressing the merits of the issues, we twice remanded this matter to the district court with instructions that it ascertain the existence of any such claims-processing documents and produce the relevant documents to Mullins. See Mullins v. AT&T Corp., 290 Fed. Appx. 642 (4th Cir. 2008) (unpublished). After the relevant documents were produced to Mullins, the district court again granted summary judgment to the defendants. The district court found that CGLIC had substantially complied with its claims-processing documents and that Mullins had failed to prove that CGLIC abused

13

its discretion in considering and denying her claim under the LTD Plan. Accordingly, the parties' cross-appeals are now back before us and ready for disposition.

## III.

We begin with Mullins' appeal of the district court's decision awarding summary judgment to the defendants on her claim for LTD benefits.

### A.

We review the district court's grant of summary judgment de novo, applying the same legal standards that the district court employed. See Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 321 (4th Cir. 2008). Where, as here, an ERISA-covered plan confers discretion on the plan's administrator to interpret its provisions and issue a determination, we review the administrator's determination under an abuse-of-discretion standard. See Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008); Evans, 514 F.3d at 321. Under the abuse-of-discretion standard, we will not set aside the plan administrator's decision if it is reasonable, even if we would have reached a different conclusion independently. See Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan, 201 F.3d 335, 341 (4th Cir. 2000). The administrator's decision is reasonable "if it is the result of a deliberate, principled

14

reasoning process and if it is supported by substantial evidence." Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995) (internal quotation marks omitted).

In Booth, we set forth eight nonexclusive factors to be considered by courts in reviewing the plan administrator's decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Booth, 201 F.3d at 342-43; see also Williams v. Metropolitan Life Ins. Co., 609 F.3d 622, 630 (4th Cir. 2010).[1]

B.

Mullins contends that the district court erred in concluding that CGLIC's decisionmaking process was reasoned and

---

[1] In Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008), the Supreme Court clarified that an administrator's conflict of interest does not alter or modify the abuse-of-discretion standard of review. See id. at 115-16; see also Williams v. Metropolitan Life Ins. Co., 609 F.3d 622, 630-31 (4th Cir. 2010). Instead, the conflict of interest is to be weighed along with other applicable factors. See Glenn, 554 U.S. at 117; Williams, 609 F.3d at 631. In this case, however, the parties agree that there was no conflict of interest.

15

principled, and erred in concluding that substantial evidence supported the denial of benefits. We disagree.

When Mullins first sought LTD benefits under the Plan, she had been seen by two surgeons and a neurologist for the pain and sensitivity in her hands. The medical opinions of Mullins' own treating physicians conflicted, however, both as to her specific diagnosis as well as to her functional capacity to perform work. Resolving such conflicts in the opinions of Mullins' treating physicians was CGLIC's responsibility and well within the discretion conferred to it under the terms of the LTD Plan. See Booth, 201 F.3d at 345; Brogan v. Holland, 105 F.3d 158, 162-63 (4th Cir. 1997). In determining that Mullins had failed to prove, as was her burden, that she was "incapable of performing the requirements of any job for any employer," J.A. 365, CGLIC reasonably considered and relied upon the opinions of Dr. Williams and Dr. Atasoy, as well as the results of the FCE, which indicated that she was capable of performing sedentary work within her limitations. CGLIC also took the additional step of obtaining both the TSA and LMS, and determined that there were actual jobs available in the market which Mullins could perform within her limitations and which exceeded the minimum wage requirement necessary for a finding against disability under the definition in the LTD Plan. Thus, CGLIC's

16

determination was clearly supported by substantial evidence in the administrative record.

Mullins acknowledges that the medical evidence was conflicting on the issue of her disability. However, she argues that we should find that CGLIC abused its discretion because it did not strictly adhere to its internal claims processing procedures when considering her claim and, consequently, denied her claim based upon evidence that it should have neither solicited nor relied upon. Most notably, Mullins contends that CGLIC was limited under its claims processing procedures to considering the opinion of Mullins' "attending physician," and asserts that while Drs. Ratliff, Strang, and Schroering might be considered "attending physicians," Drs. Williams and Atasoy should not have been.

Although the term "attending physician" is used in CGLIC's claims-processing materials, it is not defined therein and common medical definitions of that term vary depending upon the context in which it is used. For example, the meaning of "attending physician" in a hospital setting might be quite different from the meaning of that term in a non-hospital setting. The district court rejected Mullins' narrow definition of the term "attending physician" and found that its use was not intended to distinguish a claimant's primary physician from all other treating physicians, but rather to delineate physicians

17

who have actually seen and treated the claimant from those who have not.[2] At the time that Mullins filed her claim for LTD benefits, she had been seen on three occasions by Dr. Strang, the orthopedic surgeon who assumed her care after Dr. Schroering left his practice, and on one or two occasions by Dr. Williams, the neurologist who had seen her previously and to whom she was referred for additional evaluation and treatment by Dr. Strang. Under these circumstances, we agree with the district court's determination that the term "attending physician" did not exclude CGLIC's initial consideration of Dr. Williams' opinion or its later consideration of the second surgical opinion solicited from Dr. Atasoy. Furthermore, even if we were to consider the term "attending physician" to be limited to a single physician in other settings or circumstances, we cannot say that CGLIC abused its discretion or otherwise acted unreasonably in considering Drs. Williams and Atasoy to be an attending or treating physicians here, or in requesting and considering their medical records and opinions on the issue of Mullins' functional capacities and ability to work.

---

[2] We also note that the LTD Agreement between CGLIC and AT&T similarly defines an "Attending Physician" as "a duly licensed physician, psychiatrist, or psychologist treating the Claimant or Covered Person." J.A. 70.

18

Building upon this "attending physician" argument, Mullins also claims that CGLIC abused its discretion by failing to strictly follow certain preferred procedures set forth in its claims-processing documents for resolving conflicting medical information. The district court found that although CGLIC had an obligation to some degree to process Mullins' claim in accordance with these procedures, and that such compliance is always a consideration on the question of reasonableness of a decision, strict compliance is not a prerequisite to a finding that the plan administrator's overall decision was principled and reasonable.

We agree. It is well settled that the decisionmaking process by a claims administrator, including external standards relevant to the exercise of the administrator's discretion, is a factor to be considered in the overall determination of whether the administrator abused its discretion in denying LTD benefits. See Booth, 201 F.3d at 342-43. However, it is but one factor to weigh alongside the other factors and the administrative record. Cf. Glenn, 554 U.S. at 117; Williams, 609 F.3d at 631. Indeed, as noted by the district court, a contrary ruling would rob the plan administrator of the discretion granted in the same documents. Having reviewed the administrative record and the claims processing documents, we agree with the district court's determination that CGLIC substantially complied with its

19

procedures and, to the extent it varied therefrom, did not abuse its discretion in doing so.

As noted above, CGLIC was presented from the outset with conflicting medical opinions among Mullins' treating physicians regarding both her diagnosis and her ability to work. Indeed, the most direct conflict was between the surgeon who had recently assumed her care and the neurologist to whom he referred her for further evaluation and treatment. CGLIC considered the conflicting opinions of Mullins' treating physicians, solicited the opinion of a physician consultant, and obtained an FCE to independently evaluate her physical strengths and limitations for employment.[3] CGLIC then made a reasonable, principled determination that Mullins, who was in her mid-30s with some college education at the time, had failed to prove that she was "incapable of performing the requirements of any job for any employer" for which she was or could become reasonably qualified. J.A. 365.

---

[3] As correctly noted by the district court, Mullins' challenge to CGLIC's FCE referral under its internal procedures also fails to demonstrate an abuse of discretion. The procedure relied upon by Mullins does not, by its terms, apply to the FCE obtained.

IV.

We turn now to AT&T's cross-appeal of the district court's decision to impose a statutory penalty upon AT&T under 29 U.S.C. § 1132(c)(1). We review the district court's decision for an abuse of discretion. See Davis v. Featherstone, 97 F.3d 734, 735-36 (4th Cir. 1996).

In February 2001, Mullins' former counsel requested copies of the "AT&T [LTD] policy . . . and a copy of all other plan documents concerning that [LTD] policy." J.A. 63. Two months later, AT&T produced copies of the LTD plan and AT&T/CGLIC Agreement, but did not include a copy of the SPD. In March 2003, after litigation was initiated by Mullins' new counsel, AT&T produced a copy of the SPD to Mullins.

Under 29 U.S.C. § 1132(c)(1), the district court may, in its discretion, impose penalties of up to $100 per day against plan administrators who fail to furnish certain documents requested by plan participants under ERISA. See Faircloth v. Lundy Packing Co., 91 F.3d 648, 659 (4th Cir. 1996). "Two factors generally guide [the] district court's discretion: prejudice to the plaintiff and the nature of the administrator's conduct in responding to the participant's request for plan documents." Davis, 97 F.3d at 738; see also Faircloth, 91 F.3d at 659 (noting that the court may consider prejudice and bad faith in exercising its discretion).

21

The district court found that Mullins' written request for "a copy of all other plan documents concerning [the LTD] policy," was sufficient to notify AT&T that the response should include the SPD. With regard to prejudice, the district court noted that while the SPD did contain some additional information not otherwise provided in the documents produced, Mullins was not ultimately prejudiced by the delay in obtaining the information. With regard to the conduct of AT&T, the district court found that AT&T did not act in bad faith, but nevertheless had failed to produce complete information in violation of the statute. Under the circumstances, the district court concluded that the maximum penalty of $100 per day was unwarranted but that a penalty of $25 per day would be appropriate.

We cannot say that this was an abuse of the district court's discretion. "Although prejudice is a pertinent factor for the district court to consider, it is not a prerequisite to imposing a penalty." Davis, 97 F.3d at 738. It is also not necessary that the plan administrator's conduct rise to the level of bad faith. Id. Rather,

> [t]he purpose of the penalty provision is to provide plan administrators with an incentive to meet requests for information in a timely fashion. When there is some doubt about whether a claimant is entitled to the information requested, the Supreme Court has suggested that an administrator should err on the side of caution.

Id. (citation omitted); see also Faircloth, 91 F.3d at 659 ("The purpose of [§ 1132(c)(1)] is not to compensate participants for injuries, but to punish noncompliance with ERISA."). Accordingly, we affirm the grant of summary judgment to Mullins on her claim for statutory penalties under § 1132(c)(1).

## V.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the defendants on Mullins' claim for LTD benefits under 29 U.S.C. § 1132(a)(1)(B), and we affirm the district court's grant of summary judgment to Mullins on her claim for penalties under § 29 U.S.C. § 1132(c)(1).

AFFIRMED