Henry D. WADFORD, Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, Defendant.

No. 1:02CV125–C.

United States District Court,
W.D. North Carolina,
Asheville Division.

April 3, 2003.

Fred W. DeVore, III, DeVore and Acton, Charlotte, NC, for plaintiff.

Gregory W. Brown, Cranfill, Sumner & Hartzog, Raleigh, NC, Amy Shannon Sumerell, Cranfill, Sumner & Hartzog, Charlotte, NC, for defendant.

## MEMORANDUM OF DECISION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment. Although only Defendant filed a motion for summary judgment, Plaintiff seeks relief pursuant to the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, and both parties agree that the case is ripe for resolution on the administrative record. Having considered the parties' briefs and the administrative record and heard the arguments of counsel, the Court will deny Defendant's Motion for Summary Judgment, and enter judgment in favor of Plaintiff.

## BACKGROUND

This matter concerns the denial of long-term disability income benefits under ERISA. Plaintiff, Henry D. Wadford, was employed as an electrical maintenance worker by Reynolds & Reynolds from September 14, 1998 through February 24, 2000. According to a physical demands analysis completed by Plaintiff's supervisor at Reynolds & Reynolds, Plaintiff's job required approximately five hours of standing, two hours of walking, and one hour of sitting each day. (R.[1] at 90).

---

1. Defendants attached the disability insurance policy at issue, the summary plan description, and the administrative record considered by Defendant in denying Plaintiff's claim to the

Plaintiff's supervisor stated that his job required stooping, crouching, grasping and turning, reaching across, twisting his back, and bending at the waist between thirty-three and sixty-six percent of the time. (*Id.* at 91). A job information sheet describing Plaintiff's position stated that the employee must regularly lift and/or move up to twenty-five pounds and occasionally lift and/or move more than 100 pounds. (*Id.* at 92).

According to evidence in the administrative record, Plaintiff was severely injured in a motorcycle accident in 1970, which resulted in three bone grafts and required that he wear a cast for four years. (R. at 58). On February 15, 2000, Plaintiff saw treating physician, Dr. Syed Thiwan. (*Id.*) According to Dr. Thiwan's notes, Plaintiff stated that he had been having pain in his low back and left hip and leg for approximately two years, which pain had been getting worse, and that because of his pain he had difficulty walking and sleeping. (*Id.*) Dr. Thiwan also reported that Plaintiff stated that his left leg, at times, went numb and that he would trip and fall down. (*Id.*) Dr. Thiwan reported further that Plaintiff had fallen approximately three weeks earlier when his left leg "gave way," cracking his ribs on the left side. (*Id.*) Dr. Thiwan concluded that Plaintiff's left leg and lower back pain likely were caused by left hip osteoarthritis and possibly degenerative disc disease. (*Id.* at 59).

On February 16, 2000, an x-ray study of Plaintiff's spine revealed moderate degenerative disc disease at C5, C6, L2, and L3, and minimal degenerative disc disease at L4 and L5. (R. at 61). X-rays of his left

hip revealed no demonstrable acute abnormalities. (*Id.* at 61).

Plaintiff returned to Dr. Thiwan on February 23, 2000 and reported to Dr. Thiwan that his pain was getting worse and that he had not had any relief with the medication on which Dr. Thiwan placed Plaintiff after his earlier visit. (R. at 65). Dr. Thiwan diagnosed Plaintiff with degenerative disc disease of his lumbar and cervical spine, stating that there was a neuropathic component to his left leg pain. (*Id.*) Following this visit, Dr. Thiwan gave Plaintiff a work excuse until April 15, 2000. (*Id.*)

Plaintiff next saw Dr. Thiwan on March 15, 2000. (R. at 66). Plaintiff reported that he continued to have pain in his lower back and shoulder region and that his pain had a burning quality, feeling like someone was "sticking him with a hot poker in his neck and back." (*Id.*) Plaintiff reported that the medication had been providing some help but not much. (*Id.*) Concerning the numbness in his left leg, Plaintiff reported that there was some transient numbness but that it was not persistent. (*Id.*) In his findings, Dr. Thiwan noted that a nerve conduction velocity study showed some abnormalities of unclear etiology. (*Id.*)

On April 5, 2000, Plaintiff returned to Dr. Thiwan. (R. at 67). On this visit, Plaintiff reported that he had been going to physical therapy but that he thought these treatments were making his pain worse. (*Id.*) Plaintiff reported that he continued to have burning pain in his back and that the pain got worse if he started working. (*Id.*) Dr. Thiwan decided to send Plaintiff to a neurologist for an opinion and instructed Plaintiff to follow up with the

affidavit of Donna Gatling, submitted in support of Defendant's Motion for Summary Judgment. Beginning with the affidavit, the pages of these documents are numbered consecutively and will be cited as the record in

this case. Plaintiff does not dispute that these documents comprise the administrative record in this case, and the Court will refer to the documents as such.

pain clinic. (*Id.*) Finally, Dr. Thiwan noted that he would need to extend Plaintiff's work excuse up to May 31, 2000. (*Id.*)

On April 10, 2000, Plaintiff completed a short term disability claim form and submitted it to his employer, Reynolds & Reynolds. (R. at 68). Dr. Thiwan estimated on the claim form that Plaintiff would be able to return to work with no restrictions on June 1, 2000. (*Id.*)

On April 11, 2000, Plaintiff visited Dr. Ashok Pillai, a neurologist. (R. at 69–70). In his letter to Dr. Thiwan following the visit, Dr. Pillai reported that Plaintiff stated that his left leg was almost constantly numb, that he could not feel his left leg, and that his lower back pain had increased. (R. at 69). After examining Plaintiff, Dr. Pillai concluded that reflex sympathetic dystrophy likely was causing the numbness, tingling, pain and weakness in his left leg and was probably "tipped off" by Plaintiff's fall at work. (R. at 70). Dr. Pillai then ordered an MRI. (*Id.*)

On April 27, 2000, Plaintiff visited the pain clinic. (R. at 67). According to notes from Dr. Thiwan's file, Plaintiff saw Dr. Park at the pain clinic who told him that the injection he was going to give Plaintiff in his neck "[was] like a band-aid . . . which [was] temporary help only and [would] cost $3,000." (R. at 71). Plaintiff then stated that he could not afford it and left without being seen. (*Id.*) The note states that a pain clinic employee explained that financial arrangements could be made, but Plaintiff still declined treatment. (R. at 67). Dr. Thiwan's notes also suggest, however, that Plaintiff returned an hour later for his treatment. (R. at 71).

Plaintiff returned to Dr. Thiwan on May 5, 2000. (R. at 71). Dr. Thiwan noted that Plaintiff was still having pain in his neck, lower back, and left leg. (*Id.*) Dr. Thiwan noted further that the pain was worse and that Plaintiff "often trip[ped]

himself on the left leg." (*Id.*) Dr. Thiwan stated that there was evidence that Plaintiff suffered from degenerative disc disease of his cervical and lumbar spine and that the etiology of his left leg pain was unclear. (*Id.*) With respect to work, Dr. Thiwan noted the following:

> Advised him to go back to work at least part-time or on light duty job. He is hesitant. He states that he will apply for disability. I told him the process for Social Security determination. He asked me whether he should come back for follow-up or not. I left it up to him.

(*Id.*)

On May 22, 2000, Plaintiff returned to Dr. Pillai, the neurologist. (R. at 72). Dr. Pillai noted that the MRI revealed L2, 3, 4, 5, and 5 in the S–1 disc dessication, mild diffuse disc bulges, but no evidence of focal disc herniation, spinal stenosis, or definite root compression. (*Id.*) With regard to Plaintiff's numbness, tingling, and weakness in his left leg, Dr. Pillai stated that this symptom likely represented reflex sympathetic dystrophy and recommended Neurontin. (*Id.*)

Plaintiff again visited Dr. Pillai on June 22, 2000. (R. at 74). Dr. Pillai noted that Plaintiff had significant pain if he went off the medication and continued to be "unable to work as pain flares up." (*Id.*) Dr. Pillai continued to diagnose Plaintiff with probable reflex sympathetic dystrophy and noted that Plaintiff was tolerating Neurontin well but continued "to be unable to work." (*Id.*)

On August 1, 2000, Reynolds & Reynolds submitted a long-term disability benefits employer's statement on Plaintiff's behalf. (R. at 75). Reynolds & Reynolds reported Plaintiff's last day of work as February 24, 2000. (*Id.*)

On October 19, 2000, Plaintiff returned to Dr. Pillai. (R. at 76). Dr. Pillai noted

that Plaintiff had good days and bad days and continued to experience pain in his left leg, numbness, tingling, and temperature changes with pain in his lower back. (*Id.*) Dr. Pillai noted further that his daily activities of living were more manageable and that his condition was "fairly good without much problem as he [was] not working." (*Id.*) Dr. Pillai increased the dosage of his medication, stating that Plaintiff had been having "too many bad days," and instructed that Plaintiff "continue to be on disability and unable to work." (R. at 77).

On October 31, 2000, Dr. Thiwan completed a physician's statement for purposes of Plaintiff's long-term disability benefits. (R. at 78–79). Dr. Thiwan stated that Plaintiff's prognosis in terms of returning to work was "poor to fair" and stated that Plaintiff should avoid constant bending/stooping or lifting more than fifteen pounds. (R. at 79).

On November 17, 2000, a nurse working with Defendant interviewed Plaintiff. (R. at 84). According to her notes, Plaintiff reported that his leg was often numb and that a doctor had informed him that this condition was inoperable and progressive. (*Id.*) Plaintiff stated that he was unable to walk in the morning and often falls because of nerve seizures. (*Id.*) Plaintiff stated that he was unable to drive due to the pain, seizures, and numbness in his feet and that he was able provide for his personal needs but had help with household chores and other daily living activities. (*Id.*) Plaintiff reported that he walked with a cane at all times and that he was unable to sit or stand for longer than thirty minutes, or pain developed in his leg. (*Id.*)

Notes from a review of Plaintiff's medical records, conducted on December 18, 2000, stated that Plaintiff had been doing well on medications but that his pain flared up without the medications. (R. at 101).

The notes stated that Plaintiff reported having constant numbness, tingling, and pain in his left lower extremity and a lot of lower back pain. (*Id.*)

On August 17, 2001, Plaintiff returned to Dr. Pillai. (R. at 109). According to Dr. Pillai's notes, Plaintiff reported that his symptoms of numbness, tingling, and pain go up and down but are "fairly under control" with Neurontin. (*Id.*) Dr. Pillai stated also that Plaintiff continued to do fairly well but that his condition fluctuated. (*Id.*) With respect to Plaintiff's ability to work, Dr. Pillai noted that Plaintiff had applied for disability and stated, "I agree with that." (*Id.*) Dr. Pillai also noted in this report that Plaintiff was "unable to continue to be disabled." (*Id.*)

On August 22, 2001, Deborah Pfeifle, a representative for Defendant, spoke again with Plaintiff. (R. at 111). According to Ms. Pfeifle's notes, Plaintiff reported that his symptoms had stabilized to the point that he was better able to sleep at night, but he was still having severe pain in his hip and leg. (*Id.*) Plaintiff reported that he got what he described as seizures or tremors in his leg, which would give way, and that he could be standing up one minute and then fall the next, with pain in his leg and hip. (*Id.*) Plaintiff stated that his condition had not improved but had leveled off. (*Id.*) Plaintiff reported frequent swelling of his left leg and foot. (*Id.*) According to the notes, Plaintiff stated that he was able to get up, bathe and groom himself, and provide for his daily living activities. (*Id.*) Plaintiff stated, however, that he avoids stairs and was unstable at times with ambulation on a flat surface. (*Id.*) Plaintiff reported that he tried to walk 300 feet back and forth once a day to keep moving. (*Id.*) Plaintiff estimated his restrictions as no prolonged standing or walking. (*Id.*) Ms. Pfeifle concluded, after interviewing Plaintiff, that

because of his condition and the heavy physical demands of his job, his loss of functionality precluded returning to work in his previous position. (*Id.* at 112).

On October 8, 2001, Bob Cirnigliaro, a vocational case manager with Defendant, asked Dr. Thiwan to complete a short questionnaire concerning Plaintiff's ability to work. (R. at 114). Dr. Thiwan responded that he had not seen Plaintiff since May of 2000 and could not comment on the questions posed by Mr. Cirnigliaro. (*Id.*)

On October 17, 2001, Dr. Pillai's office faxed a questionnaire and request for medical records back to Defendant. (R. at 116). Although this questionnaire does not appear to be signed, it states that Plaintiff's prognosis for return to work as "poor," and lists "N/A" as his estimated return to work date. (*Id.*) On the form, "disability" is defined as "an inability, due to functional loss, related to an accident or sickness, to perform the substantial and material duties of one's job or occupation in accordance with policy provisions." (*Id.*)

On November 20, 2001, Mr. Cirnigliaro completed a vocational assessment in Plaintiff's case. (R. at 121). After reviewing Plaintiff's medical records and notes from interviews, Mr. Cirnigliaro noted that Dr. Thiwan stated that Plaintiff needed to avoid constant bending/stooping and lifting greater than fifteen pounds and had advised him, in May of 2000, to return to work part-time or on light duty. (*Id.*) Mr. Cirnigliaro noted further that Dr. Pillai noted on August 17, 2001 that Plaintiff was unable to continue to be disabled. (*Id.*) Mr. Cirnigliaro also noted that Plaintiff had reported that his self-care was okay and that he walked as much as he could and drove locally. (*Id.*) Mr. Cirnigliaro concluded that based on his functional restrictions, Plaintiff was able to perform the alternative, trainable occupations of reservations clerk in the hospitality industry, burglar alarm monitor in the service industry, and small parts assembler in the service industry. (*Id.* at 122).

On November 15, 2001, the Social Security Administration issued its decision granting Plaintiff disability insurance benefits and concluding that Plaintiff had been unable to perform any substantial gainful activity since February 25, 2000 and that there were no jobs existing in significant numbers which he could perform. (R. at 127, 129). In reaching his decision, the administrative law judge considered the reports of Dr. Pillai and found that Plaintiff's pain in his low back and lower extremities would prevent "prolonged standing, walking, sitting, bending, climbing, balancing, and stooping" and would cause frequent job absences. (*Id.* at 128).

On November 21, 2001, Mr. Cirnigliaro sent Plaintiff a letter notifying him that given the restrictions noted by Dr. Thiwan and Dr. Pillai's note that Plaintiff was unable to continue to be disabled, Defendant had concluded that Plaintiff was able to work within the restrictions established by Dr. Thiwan. (R. at 123). Mr. Cirnigliaro noted that Plaintiff's twelve-month long-term disability benefits, based on his inability to work in his own occupation, had ended August 23, 2001, but Defendant had continued to pay the benefits pending its investigation. (*Id.*) Mr. Cirnigliaro then informed Plaintiff that his benefits would end on December 1, 2001. (*Id.*)

On November 27, 2001, Plaintiff sent Mr. Cirnigliaro a letter appealing Defendant's decision. (R. at 125). Plaintiff attached to his written notice of appeal the decision by the Social Security administration awarding benefits based on a finding of disability. (*Id.* at 127–30).

On December 3, 2001, Mr. Cirnigliaro sent Plaintiff a letter stating that he had reviewed Plaintiff's letter and the determination of disability issued by the Social Security Administration and left unchanged his original decision denying long-term disability insurance benefits. (R. at 135). Mr. Cirnigliaro stated in the letter that the medical evidence did not support a severity in function that would preclude Plaintiff from performing the alternative positions he identified in his earlier letter and that none of those positions require prolonged standing, walking, sitting, bending, climbing, balancing, or stooping. (*Id.*)

On January 10, 2001, Defendant affirmed its original decision to deny benefits. (R. at 136–37). While Defendant's representative acknowledged that Plaintiff would "experience some problems associated with [his] condition," she stated that Plaintiff's medical evidence failed to substantiate an impairment that would prevent him from returning to work. (*Id.* at 137). In particular, Defendant's appeals committee member noted that Dr. Pillai noted on August 17, 2001 that Plaintiff's symptoms were fairly under control and that while Dr. Pillai agreed with his decision to apply for disability, his notes reflected that Plaintiff was doing fairly well. (*Id.*)

On March 18, 2002, Dr. Pillai issued a correction for the letter previously dictated on August 17, 2001 and concerning Plaintiff's visit to him on that same date. (R. at 143). This memorandum stated that instead of stating that Plaintiff was "unable to continue to be disabled," his letter should read, "Patient is unable to continue to do any work and is disabled secondary to the same reason." (*Id.*) This memorandum stated further: "Plaintiff was since then seen on 01/17/02. His condition has no change and continues to be disabled and is unable to do any work for the same." (*Id.*)

On March 21, 2002, Plaintiff's counsel sent a letter to Defendant requesting that Defendant reconsider its denial of Plaintiff's claim in light of Dr. Pillai's memorandum correcting his earlier medical notes. (R. at 144). On April 2, 2002, Mr. Cirnigliaro sent Plaintiff's counsel notice that Defendant would not change its decision to terminate Plaintiff's benefits. (R. at 145). In the notice, Mr. Cirnigliaro noted that, regardless of the typographical error, Dr. Pillai's notes from Plaintiff's August 2001 visit stated that Plaintiff's symptoms were fairly under control with medication and that Plaintiff was stable and doing fairly well. (*Id.*) Mr. Cirnigliaro also noted Dr. Thiwan's restrictions and Dr. Thiwan's advice to Plaintiff to return to work on light duty or part-time in May of 2000. (*Id.*) Mr. Cirnigliaro then noted that Defendant's letter to Plaintiff of January 10, 2002 informed him that all administrative remedies had been exhausted and that Defendant's decision was final and binding. (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). As the facts are not in dispute in this case, both parties agree that the case is appropriate for resolution on summary judgment.

## PERTINENT PLAN PROVISIONS

The parties agree that the applicable disability insurance plan in this case is Defendant's Group Policy No. SR–83081206 ("the Plan"), as issued by Defen-

dant to Reynolds & Reynolds. With respect to the payment of disability benefits, the Plan provides that "[w]hen making a benefit determination under the policy, *We* have discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy." (R. at 10) (emphasis in original). Also pertinent to this case, under the definition of disability, the Plan provides that during the elimination period and the following twelve months, an employee is disabled for purposes of the Plan if injury or sickness causes physical or mental impairment to such a degree of severity that the employee is: (1) continuously unable to perform the material and substantial duties of his regular occupation; and (2) not working for wages in any occupation for which he is or becomes qualified by education, training, or experience. (R. at 11). After the monthly benefit has been payable for twelve months, the definition of disability changes. At that point, "disability" means that injury or sickness causes physical or mental impairment to such a degree of severity that the employee is: (1) continuously unable to engage in *any* occupation for which he is or becomes qualified by education, training, or experience; and (2) not working for wages in any occupation for which he is or becomes qualified by education, training, or experience. (*Id.*) With respect to an employee's responsibility for establishing disability, the Plan provides that among other items of proof that must be submitted to support a claim of disability, an employee must produce proof that he is "receiving *Appropriate and Regular Care*" for his condition from a "doctor," defined as someone other than the employee or his immediate family, whose specialty or expertise is the most appropriate for his disabling condition according to generally accepted medical practice. (R. at 18) (emphasis in original).

## STANDARD OF REVIEW

It is well settled that a court reviewing the denial of disability benefits under ERISA must first decide whether the benefit plan's language "grants the administrator or fiduciary discretion to determine the claimant's eligibility for benefits." *Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 268 (4th Cir.2002). If the benefit plan gives the administrator or fiduciary such discretion, "a reviewing court may reverse the denial of benefits only upon a finding of abuse of discretion." *Elliott v. Sara Lee Corp.,* 190 F.3d 601, 605 (4th Cir.1999). If, however, the plan does not explicitly give the administrator or fiduciary discretion, the court's review is *de novo. Gallagher,* 305 F.3d at 269; *see also Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989) ("a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"). In determining whether a particular plan grants the administrator or fiduciary discretionary authority, the court does not require the use of specific language; rather, the court "examine[s] the terms of the plan to determine if it vests in its administrators discretion either to settle disputed eligibility questions or construe doubtful provisions of the Plan." *Feder v. Paul Revere Life Ins. Co.,* 228 F.3d 518, 522 (4th Cir.2000). Where, however, the plan's language "expressly creates discretionary authority," the court will find discretionary authority in the administrator to exist. *Id.*

In this case, the Plan explicitly grants Defendant "discretionary authority to determine [the employee's] eligibility for benefits and to interpret the terms and

provisions of the policy." (R. at 10). As this language is clear and unambiguously grants Defendant discretion to determine eligibility for benefits and to interpret the terms of the Plan, the appropriate standard of review is abuse of discretion.

■ Under an abuse of discretion standard, the administrator's decision "will not be disturbed if it 'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence,'" even if this Court would have reached a different conclusion. *Elliott,* 190 F.3d at 605 (quoting *Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir.1997)); *see also Feder,* 228 F.3d at 522. Even under this deferential standard of review, however, evidence that the administrator or fiduciary who denied benefits was operating under a conflict of interest is relevant and "must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Bruch,* 489 U.S. at 115, 109 S.Ct. at 957 (quoting Restatement (Second) of Trusts § 187, cmt. d (1959)). Thus, the Fourth Circuit has explained: "The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 233 (4th Cir.1997).

■ In this case, it is clear from the record that Defendant was both the administrator of the Plan, rendering decisions as to benefit eligibility and Plan interpretation, and a fiduciary, required by the terms of ERISA to act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). It is also clear that Defendant's employees were vested with the responsibility to make decisions in the interest of the participants, while simultaneously serving an employer that would ultimately have to pay the benefits if the employees determined benefits were due to be paid. Accordingly, Defendant was acting under a conflict of interest, requiring this Court to apply a modified abuse of discretion standard of review to its decision to deny Plaintiff benefits.

## DISCUSSION

■ In determining whether a plan administrator has abused its discretion in the denial of benefits, the Fourth Circuit has identified eight factors that a reviewing court may consider, though it is not limited to these factors:

(1) the language of the plan;

(2) the purposes and goals of the plan;

(3) the adequacy of the materials considered to make the decision and the degree to which they support it;

(4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;

(5) whether the decision-making process was reasoned and principled;

(6) whether the decision was consistent with the procedural and substantive requirements of ERISA;

(7) any external standard relevant to the exercise of discretion; and

(8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal–Mart Stores, Inc. Associates Health and Welfare Plan,* 201 F.3d 335, 342–43 (4th Cir.2000). In this case, considering especially the degree to which the materials before Defendant supported its decision and whether the decision-making process was reasoned and principled, the Court finds that, under a modified abuse of discretion standard, Defendant abused its discretion in denying long term disability income benefits to Plaintiff.

First, when considering the totality of the medical evidence produced by Plaintiff in support of his claim for benefits, there is little evidence supporting Defendant's conclusion that Plaintiff is able to perform, even with additional training, alternative employment. Throughout the course of Plaintiff's treatment by both Dr. Thiwan and Dr. Pillai, both physicians reported that Plaintiff complained of pain, numbness, tingling, and weakness in his left leg, causing it unexpectedly to fail periodically, and significant pain and temperature changes in his neck, back, and shoulder areas. Plaintiff also reported, throughout his treatment, that he fell regularly when his left foot or leg would suddenly fail. Dr. Thiwan excused Plaintiff from work through the end of May 2000 and referred him to Dr. Pillai. Dr. Pillai diagnosed Plaintiff as suffering from reflex sympathetic dystrophy and never wavered in his opinion that Plaintiff was unable to work. Plaintiff was also diagnosed with degenerative disc disease in numerous vertebrae, and an MRI revealed mild disc bulges. In October of 2000, Dr. Pillai examined Plaintiff and determined that he still was having too many bad days, leading him to increase Plaintiff's dosage of Neurontin. While Dr. Pillai noted following Plaintiff's visit that Plaintiff was managing his daily living activities better, he also noted that his condition was more manageable because Plaintiff was not working, and he instructed Plaintiff to continue on disability. Notes from interviews with Plaintiff, conducted by Defendant's representative in November of 2000, reflect that Plaintiff was unable to walk in the morning, often fell because of "nerve seizures," and was unable to stand or sit for longer than thirty minutes because of pain. While Dr. Pillai's notes from August of 2001 reflect that Plaintiff's symptoms were "fairly under control" with medication, Dr. Pillai also noted that Plaintiff's condition continued to fluctuate and that he continued to be disabled. Also in August of 2001, Plaintiff reported to Defendant's representative that while he was better able to sleep at night due to the medication, he continued to experience seizures or tremors in his leg and that he would be standing up one minute and fall the next. Plaintiff also reported frequent swelling of his left leg and foot and severe pain in his hip and leg. In November 2001, the Social Security Administration issued its decision in which the administrative law judge concluded that Plaintiff's pain in his back and leg would prevent prolonged standing, walking, sitting, bending, climbing, balancing, and stooping and would cause frequent job absences. In March 2002, Dr. Pillai reaffirmed his previous opinion that Plaintiff was disabled, stating unequivocally that Plaintiff continued to be disabled and unable to do any work.

■ In explaining its decision and subsequent affirmances of its decision denying Plaintiff benefits, Defendant's representatives fail to mention the severity of Plaintiff's pain, his consistent reports of falling suddenly when his left leg would give way, Dr. Pillai's diagnosis, or Dr. Pillai's conclusion that Plaintiff was unable to perform any work. Instead, Defendant's explanations rely heavily on Dr. Thiwan's recommendation in May of 2000 that Defendant return to work part-time or on light duty and on his statement in October 2000 that Plaintiff's restrictions were to avoid prolonged bending or stooping and not to lift more than fifteen pounds. Defendant's reliance on these statements, however, ignores that Dr. Thiwan's functional assessment was based on Plaintiff's condition in May of 2000, the last time Dr. Thiwan examined Plaintiff, and that Dr. Thiwan's notes on the same date reflect that Plaintiff's pain had gotten worse and that Plaintiff "often trip[ped] himself on the left

leg." (R. at 71). Defendant's reliance on Dr. Thiwan's recommendation also ignores the fact that Dr. Thiwan himself had referred Plaintiff to a neurologist for an opinion and treatment. Plaintiff then began being treated exclusively by the neurologist, Dr. Pillai, and Dr. Pillai, who specialized in neurological injuries and diseases, never wavered from his opinion that Plaintiff was unable to perform any work. While the Court recognizes that a treating physician's opinion as to the ultimate determination of disability is entitled to little deference where there is no evidence the physician possesses vocational expertise, see *Willis v. Baxter Internat'l, Inc.*, 175 F.Supp.2d 819, 832 (W.D.N.C.2001), it is still probative evidence that must at least be considered in conjunction with the medical evidence on which the physician relied.

The explanations offered by Defendant's representatives also rely on Dr. Pillai's notes from August 17, 2001 that Plaintiff's symptoms were "fairly under control" with Neurontin and that Plaintiff was doing fairly well. Defendant's explanations fail to mention, however, that Dr. Pillai also noted that while Plaintiff was doing fairly well, his condition fluctuated and that Dr. Pillai supported Plaintiff's decision to apply for disability benefits, opining that Plaintiff was unable to perform any work. Additionally, that Plaintiff's symptoms were "fairly under control" or that Plaintiff was doing "fairly well" does not reveal much about Plaintiff's condition, as those phrases are somewhat equivocal and Dr. Pillai did not explain what he meant by them. For example, if Plaintiff had been experiencing frequent severe pain, as reported prior to August of 2001, Dr. Pillai might have meant only that Plaintiff was able to sleep better and experienced severe pain only several times a day or for shorter periods of time. Dr. Pillai did not state that Plaintiff was doing well; rather, he qualified his assessment, and this quali-

fication means that the assessment is not particularly helpful in determining Plaintiff's condition or the ways in which his condition affected his ability to work.

Finally, with respect to the evidence before Defendant when it rendered its decision, while Defendant's explanations noted that Plaintiff stated that he tried to walk a certain distance each day and could provide for his daily living activities, Defendant's representatives never appeared to take into account the undisputed evidence that Plaintiff regularly experienced numbness and tingling in his left leg, described by Plaintiff as nerve seizures, which would cause him suddenly to fall, nor did they appear to consider the severity of Plaintiff's pain or the evidence that increased activity would lead to an increase in his pain. In sum, in evaluating the evidence before them, Defendant's representatives isolated several comments or notes suggesting that Plaintiff was not so functionally impaired as to be unable, with sufficient training, to perform alternative work. Defendant's representatives, however, failed to consider those comments or notes in context, nor did they appear even to consider the contradictory evidence, particularly evidence as to the severity of Defendant's pain, the continued fluctuation in his condition, and the regular failure of his left leg. For these reasons, the Court finds that the third factor discussed by the Fourth Circuit in *Booth*—the adequacy of the materials considered to make the decision and the degree to which they support it—weighs against upholding Defendant's decision to deny benefits in this case.

The Court is also disturbed by Defendant's apparent failure to make its decision after a reasoned and principled decision-making process. In particular, the Court notes, as set forth above, that Defendant failed entirely to explain its decision to credit isolated opinions in the administra-

tive record, while ignoring or rejecting the context in which those opinions were rendered or failing to explain why it credited some evidence to the exclusion of other evidence contained later in the administrative record. Additionally, Defendant appeared to rely almost exclusively on the opinion of its vocational case manager, Bob Cirnigliaro, yet there is no evidence in the record as to his qualifications, nor did Defendant decide to obtain an independent medical opinion as to Plaintiff's medical condition. While Defendant unquestionably is not required to obtain an independent medical evaluation of a claimant's condition, in this case, the medical evidence from the eighteen months prior to Defendant's final decision established that Plaintiff suffered from severe pain only partially controlled by medication and a condition that would cause him regularly to fall. Additionally, his sole treating physician during that time opined that Plaintiff was unable to perform any work. In light of this evidence, a decision-making process culminating in the denial of benefits without obtaining an independent medical opinion to support that denial cannot be called either reasoned or principled.

As a final matter, the Court notes that although Defendant never suggested during the administrative review process that Plaintiff had failed to produce sufficient evidence that he was under the regular care of a physician, justifying Defendant's decision to deny Plaintiff benefits, Defendant did make that argument during oral argument before this Court and mentioned that issue, almost in passing, in its brief in support of summary judgment. Specifically, Defendant argues that Plaintiff's failure to see a physician between October 19, 2000 and August 17, 2001 establishes that he was not under the regular care of a physician. Dr. Pillai's notes from Plaintiff's October 19, 2000 visit, however, reflect that he instructed Plaintiff to follow

up in five to six months, indicating that Dr. Pillai, at the least, believed Plaintiff's condition to be fairly stable and not to warrant the frequent visits he had made in the initial months following his February 2000 fall. While Plaintiff waited approximately ten months to visit Dr. Pillai again, he then saw Dr. Pillai in January of 2002, and particularly as the Plan does not define "appropriate and regular care," the Court cannot hold that Plaintiff's failure to see Dr. Pillai for ten months, when he otherwise maintained very regular contact, constituted a failure to continue in the appropriate and regular care of a physician as required by the Plan. Defendant did not cite this gap in treatment as justification for its denial of Plaintiff's benefits, and the Court likewise finds the gap to an insufficient basis on which to affirm Defendant's decision.

## CONCLUSION

As set forth above, under an abuse of discretion standard, the administrator's decision "will not be disturbed if it 'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence,'" even if this Court would have reached a different conclusion. *Elliott,* 190 F.3d at 605 (quoting *Brogan,* 105 F.3d at 161); *see also Feder,* 228 F.3d at 522. Here, because Defendant stood to benefit economically from a denial of Plaintiff's claim, its decision must be "more objectively reasonable" and the evidence to support it "more substantial" than that required of an administrator or fiduciary not rendering its decision under a conflict of interest. *See Ellis,* 126 F.3d at 233. Given Defendant's apparent failure to consider so much of the medical evidence before it and to reject, without explanation or contradicting evidence, Plaintiff's treating physician's opinion of total disability, this Court cannot say Defendant's denial

of Plaintiff's claim was the result of a deliberate, principled reasoning process. In this case, Defendant's decision, in light of the evidence before, was neither objectively reasonable nor supported by substantial evidence. Accordingly, the Court will deny Defendant's motion for summary judgment and enter judgment in favor of Plaintiff. Judgment will be entered contemporaneously herewith.