**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 03-2425**

---

SANDRA ABROMITIS,

Plaintiff - Appellant,

versus

CONTINENTAL CASUALTY COMPANY/CNA INSURANCE
COMPANIES,

Defendant - Appellee.

---

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Max O. Cogburn, Jr., Magistrate Judge. (CA-02-165-C-1)

---

Argued: September 30, 2004        Decided: November 5, 2004

---

Before WIDENER, NIEMEYER, and LUTTIG, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Luttig wrote the opinion, in which Judge Widener and Judge Niemeyer joined.

---

**ARGUED:** Candy Maria Kern-Fuller, FOSTER LAW FIRM, L.L.P., Greenville, South Carolina, for Appellant. Ingrid Blackwelder Erwin, JACKSON LEWIS, L.L.P., Greenville, South Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

LUTTIG, Circuit Judge:

Plaintiff-appellant Sandra Abromitis appeals from an order of the United States District Court for the Western District of North Carolina granting summary judgment to defendant-appellee Continental Casualty Co./CNA Insurance Companies ("CNA"). The district court held that CNA did not abuse its discretion in terminating Abromitis' long-term disability ("LTD") benefits under an ERISA-governed employee benefits plan. Because we agree that CNA did not abuse its discretion, we affirm the judgment of the district court.

I.

Appellant Abromitis was employed by Aris Corporation as a "principal consultant and systems analyst" prior to December 1999. J.A. 261. Her job required frequent travel and constant availability for travel. During her employment at Aris, Abromitis participated in an employee benefits plan ("the Plan") administered by CNA on behalf of her employer. The Plan is an employee welfare benefit plan within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. According to the terms of the Plan, an individual with a "total disability" is entitled to LTD benefits. J.A. 866. The Plan provides a two-part definition of "total disability." During the "Your Occupation" period of the first 24 months, "total disability" means that,

-2-

[y]ou, because of Injury or Sickness, are:
(1) continuously unable to perform the substantial and material duties of Your regular occupation;
(2) under the regular care of a licensed physician other than Yourself; and
(3) not gainfully employed in any occupation for which You are or become qualified by education, training or experience.

J.A. 866. After the 24-month "Your Occupation" period, "total disability" means that,

[B]ecause of Injury or Sickness, You are:
(1) continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and
(2) under the regular care of a licensed physician other than Yourself.

J.A. 866. The Plan also provides that its administrator "ha[s] discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan." J.A. 871.

Abromitis applied for disability benefits under the Plan in February 2000, after her fourth hip replacement surgery rendered walking difficult. In support of her application, she submitted a report from her orthopedist, Dr. Karegeannes, which asserted that she would not be able to return to work until August 2000. J.A. 838. CNA awarded her disability benefits through August. In August, as part of a successful application for an extension of her benefits, Abromitis reported to CNA that she still walked painfully with a cane, and said of her job that "it's the travel I have a hard time with." J.A. 813. And in December 2000, Dr. Karegeannes

reported that Abromitis' recovery was slow and recommended extending her disability benefits for another six months. J.A. 583.

On March 15, 2001, Dr. Karegeannes reported to CNA that Abromitis was capable of "sedentary to light work with <u>no travel</u> and sit/stand option." J.A. 572 (emphasis added). On the basis of this report, CNA terminated Abromitis' benefits. Abromitis appealed the decision, arguing that the Plan's 24-month "Your Occupation" period was still in effect and that she was incapable of the frequent travel that was an essential part of her former job. J.A. 535-36. CNA reinstated her benefits on July 18, 2001.

On October 24, 2001, still during the "Your Occupation" period, CNA notified Abromitis that it would terminate her benefits in December. She appealed again, submitting a report from Dr. Karegeannes dated November 15, which stated:

> I suspect that this late date [sic], the patient will be unable to return to <u>the work she was previously involved with</u>. She is unable to sit for any significant period of time. . . . Generalized problems seem to have accumulated to the point that it is difficult for her to do anything <u>similar to what she has done in the past</u>.

J.A. 359 (emphases added). Dr. Karegeannes also submitted a functional capacity exam ("FCE") dated November 27, 2001. His FCE report listed Abromitis' diagnoses as hip dysplasia, spine arthritis, and bursitis, and it listed physical limitations that were inconsistent with travel but consistent with sedentary work with a sit/stand option for frequent changes of position. J.A.

-4-

676-77.  On January 17, 2002, CNA again reinstated Abromitis' benefits.

In February 2002, CNA hired Dr. Flora Pinder to perform a labor market survey in Abromitis' geographical area to determine the availability of sedentary jobs with a sit/stand option for changing position.  J.A. 323.  Dr. Pinder identified four potential employers in the area with qualifying positions.  J.A. 324-36.  All of these jobs required keyboarding work.  J.A. 321-22.

On February 11, CNA notified Abromitis that it would terminate her benefits on April 30 at the end of the "Your Occupation" period, when the travel requirement of her former job became inapplicable under the Plan's two-stage definition of total disability.  J.A. 383-84.  CNA noted that Dr. Pinder's labor market survey had identified jobs compatible with the limitations reported by Dr. Karegeannes in the November 2001 FCE, and that Dr. Karegeannes had opined in March 2001 that Abromitis was capable of sedentary work with no travel.  J.A. 383.

Abromitis appealed CNA's decision to terminate her benefits, submitting several new pieces of evidence.  First, she submitted a report from Dr. Cammarata, a hand specialist, who concluded that Abromitis suffered from osteoarthritis of the hands, based on x-rays and a physical examination conducted on February 11, 2001.  J.A. 351-52.  This report did not indicate any functional limitations.  J.A. 351-52.  Second, she submitted a report from

Maggie Kelly, a "rehabilitation counselor," who reviewed Abromitis' medical records and reported that it was "uncertain whether [Abromitis] could work an 8-hour day" due to her multiple medical problems and arthritis-related difficulties with keyboarding. J.A. 338. Third, Abromitis submitted a report from Dr. Burke, who examined her for the first time on February 15 and diagnosed her with chronic mechanical pain, osteoarthritis, fibromyalgia (i.e. back and neck pain), and pelvic obliquity. J.A. 347, 349. Finally, in a personal affidavit, Abromitis alleged that the impediments to her ability to work included hand arthritis, back pain, physical therapy "nearly every weekday," and migraine headaches.[1] J.A. 334. In June, CNA denied her appeal.

Abromitis subsequently filed suit in the district court, seeking restoration of her benefits under the Plan. During discovery, Abromitis requested information about the extent of business contacts between CNA and Dr. Pinder, who had performed the labor market survey. J.A. 22. The district court denied the discovery request. J.A. 59. On cross-motions for summary judgment, the district court granted summary judgment for CNA. J.A. 275. On appeal, Abromitis challenges both the order denying

---

[1] Apparently, Abromitis had suffered migraine headaches for many years. But on April 25, 2001, a nurse practitioner reported that Abromitis' headaches had been effectively controlled by pain medication. J.A. 422.

her motion to compel discovery and the order granting summary judgment to CNA.

## II.

During discovery, Abromitis requested information about the number of contracts between CNA and Dr. Pinder over the previous three years and the total amount of money that CNA paid Dr. Pinder under those contracts. J.A. 22. In her motion to compel discovery, Abromitis argued that, because of a conflict of interest, Pinder consistently "tailor[ed] her reports [about job availability] to support claim denials." J.A. 23. The district court denied Abromitis' motion to compel discovery, J.A. 59, and Abromitis challenges this ruling on appeal.

We review the denial of a motion to compel discovery for abuse of discretion, Erdmann v. Preferred Research, Inc., 852 F.2d 788, 792 (4th Cir. 1988), and we conclude that the district court did not abuse its discretion here. On appeal, Abromitis argues that Pinder's labor market survey, upon which CNA in part based its decision to terminate her benefits, was tainted by a conflict of interest, and that the degree of this conflict of interest was relevant to the district court's review of CNA's decision. Appellant's Br. at 23-29. But, as the district court correctly noted, it is the administrator's conflict of interest that is relevant to the conflict-of-interest review conducted by the

-7-

district court -- not the plainly evident "conflict of interest" of the administrator's <u>paid</u> employees and consultants.  <u>See</u> J.A. 57 ("[I]t is not the conflict of interest of a consultant employed by a fiduciary that the Fourth Circuit has held is relevant."); <u>see also</u> <u>Booth</u> v. <u>Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan</u>, 201 F.3d 335, 343 n.2 (4th Cir. 2000) ("A <u>fiduciary's</u> conflict of interest . . . may operate to reduce the deference given to a discretionary decision of that fiduciary." (emphasis added)).  It was therefore irrelevant how much business CNA provided to Dr. Pinder, and the district court properly denied discovery on that issue.[2]

### III.

Abromitis also challenges the district court's order awarding summary judgment to CNA.  We review the district court's grant of summary judgment de novo, applying the same standards as the district court.  <u>Gallagher</u> v. <u>Reliance Std. Life Ins. Co.</u>, 305 F.3d

---

[2] One <u>relevant</u> question might have been whether the survey upon which CNA relied provided <u>false or inaccurate</u> information, rendering CNA's decisionmaking process unreliable.  But Pinder's survey simply recited several listings of sedentary jobs with a sit/stand option in Abromitis' area, based on contacting employers by telephone.  J.A. 324-26.  Abromitis does not dispute the accuracy of any fact in the survey.  Rather, she argues only that she could not <u>perform</u> the jobs that Pinder found because of her medical problems and her lack of computer programming skills.  <u>Appellant's Br.</u> at 12.  This is a challenge to CNA's conclusion about her physical capabilities, not to Pinder's research.  The issue of Pinder's purported bias is thus all the more irrelevant.

264, 268 (4th Cir. 2002). Where, as here, an ERISA plan gives the plan administrator discretionary authority to interpret the terms of the plan, the district court reviews the administrator's decisions for abuse of discretion. Booth, 201 F.3d at 341. Under the abuse of discretion standard, the court may not overturn the administrator's denial of benefits if the denial "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Elliot v. Sara Lee Corp., 109 F.3d 601, 605 (4th Cir. 1999).

Because CNA both administers and funds the plan, however, we adjust the standard of review by decreasing our deference to CNA in proportion to the degree of CNA's conflict of interest. In such circumstances, we must determine whether the denial of benefits would constitute an abuse of discretion by a disinterested fiduciary. See, e.g., Bailey v. Blue Cross & Blue Shield of Virginia, 67 F.3d 53, 56 (4th Cir. 1995) ("[W]e will review the merits of the [funding fiduciary's] interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries."). Even on this adjusted scale of deference, we conclude that CNA did not abuse its discretion because its decision to terminate Abromitis' benefits was the result of a deliberate,

principled reasoning process and supported by substantial evidence.[3]

We conclude that CNA's decision was supported by substantial evidence. In defending its decision, CNA relies primarily on Dr. Karegeannes' evaluations of Abromitis' sedentary work capacity of March 2001 and November 2001. On March 15, 2001, he classified Abromitis as capable of "sedentary to light work with no travel and sit/stand option." J.A. 572. His November 15 remarks indicated that Abromitis could not return to "the work she was previously involved with," J.A. 359, but his November 27 evaluation listed restrictions consistent with sedentary occupation with a 30-minute sit/stand option. J.A. 676. And none of his other reports on Abromitis' condition during the "Your Occupation" period identified any objective obstacles to Abromitis' performance of sedentary work. See J.A. 361, 399, 583, 701, 758.

To contradict Dr. Karegeannes' conclusion that she was capable of sedentary work, Abromitis relies on her own affidavit and the reports of Dr. Burke, Dr. Cammarata, and Maggie Kelly. But none of these reports contradicts Dr. Karegeannes' evaluation with any

_____

[3] Aside from the alleged conflict of interest of Dr. Pinder, discussed above, the only defect in CNA's reasoning process that Abromitis identifies is CNA's failure to perform "any meaningful medical review" of her case after August 2000. Appellant's Br. at 39. But because CNA's decision was based largely on the reports of Dr. Karegeannes from March and November of 2001, this argument is without merit. Accordingly, we focus our discussion on the substantiality of evidence supporting CNA's decision.

-10-

specific findings to the contrary. Abromitis' affidavit includes subjective pain complaints but no medical evidence. J.A. 334. Dr. Burke's report was based on a single examination in anticipation of litigation, in contrast to Dr. Karegeannes' years of treating the patient, and Dr. Burke identified no specific functional limitations to contradict Dr. Karegeannes' evaluation of Abromitis' physical abilities in November FCE. J.A. 313-14. Likewise, Dr. Cammarata's diagnosis of hand arthritis did not identify any specific functional limitations such as the inability to type. J.A. 351-52. And Maggie Kelly's report was ambiguous as to Abromitis' ability to perform a sedentary job. J.A. 338 (finding it "<u>uncertain</u> whether Mrs. Abromitis could work an 8-hour day" (emphasis added)).

Therefore, it was reasonable for CNA to rely on Dr. Karegeannes' representation that Abromitis was capable of sedentary work with the option of changing positions every thirty minutes. J.A. 572. Dr. Pinder's labor market survey identified local sedentary jobs that permitted such changes of position. J.A. 324-26. CNA could thus fairly conclude that Abromitis was not "unable to engage in <u>any</u> occupation for which [she was] qualified by education, training or experience," as the Plan required. J.A. 866 (emphasis added).

It follows that CNA's decision was supported by substantial evidence.  The district court's ruling that CNA did not abuse its discretion was thus correct.


CONCLUSION

For the reasons stated herein, the judgment of the district court is affirmed.


<u>AFFIRMED</u>